**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 09 C 2107 |
| | ) |
| **ROBERT A. BURKE,** | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Robert Burke was convicted by a jury of five counts of perjury, 18 U.S.C. § 1623, and this court sentenced him to a term of 240 months. Burke's conviction and sentence were affirmed in two appeals. *United States v. Burke*, 425 F.3d 400 (7th Cir. 2005) (conviction); *United States v. Burke*, 281 F. App'x 556 (7th Cir. 2008) (sentence). He now moves the court, pursuant to 28 U.S.C. § 2255, to vacate his convictions or, in the alternative, reduce his sentence. In support of his motion, Burke argues, first, that the lawyers who represented him on appeal, including Thomas Durkin, were constitutionally ineffective for failing to challenge the court's order disqualifying Durkin as trial counsel. Burke also argues that appellate counsel and trial counsel were ineffective for failing to properly raise the argument that four of his perjury counts were multiplicitous, and, therefore, that sentencing him to consecutive terms for each conviction violated the Double Jeopardy Clause.

## BACKGROUND

Burke's conviction has its roots in an infamous event in this court's history, in which two federal officers lost their lives. On June 20, 1992, Jeffrey Erickson was being transported from the Courthouse, where he was on trial for bank robbery, back to the Metropolitan Correctional Center ("MCC"), where he was being housed. While riding the elevator to the basement where a transport bus was waiting, Erickson was able to remove his handcuffs using a key that had been smuggled into his possession. Once he exited the elevator in the basement, Erickson overpowered a deputy

U.S. Marshal and seized her revolver. With the weapon, Erickson shot and killed U.S. Marshal Roy Frakes and continued out of the basement. As he ran up the ramp to Jackson Street, Erickson exchanged fire with Court Security Officer Harry Belluomini, who Erickson also shot and killed. Erickson, himself wounded by the shots from Belluomini, stopped halfway up the ramp and killed himself with a gunshot to the head. The handcuff key was found beside Erickson's body.

Erickson had been housed at the MCC with Burke, who, at the time, was awaiting trial for bank theft. As part of a large-scale investigation into Erickson's escape attempt, Burke was interviewed but denied any involvement. In September 1992, Burke pleaded guilty to two charges of bank theft and served about half of a five-year sentence. Upon his release in 1994, Burke violated the terms of his supervised release by fleeing the United States. He was arrested in London in 1998 but successfully fought extradition for two years until he was returned to the United States. *See In re Burke*, [2001] 1 A.C. 422 (H.L.) (appeal taken from Q.B.) Under the Rule of Specialty, as codified in the extradition treaty between the United States and the United Kingdom, an extradited defendant may be prosecuted only for the crime for which he is extradited or for offenses committed after the extradition. *Burke*, 425 F.3d at 408 (*citing* Extradition Treaty Between the United States and United Kingdom, June 21, 1977, 29 U.S.T. 227, T.I.A.S. No. 8468). Thus, because Burke was extradited for violating the terms of his supervised release, he could not be charged with assisting Erickson, absent a second round of extradition proceedings or a waiver of the Rule by the United Kingdom. *See* UNITED STATES ATTORNEYS' MANUAL at 9-15.500, *available at* http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/15mcrm.htm#9-15.500 (last visited Apr. 16, 2010). The Government chose not to attempt such a prosecution. Instead, the Government granted Burke immunity from prosecution regarding the escape attempt, thereby forcing him to give testify before the grand jury. In his testimony, Burke denied any involvement with Erickson's acquisition of the handcuff key and denied ever talking to Erickson or other inmates about the key.

The Government concluded that Burke's testimony was false, and on December 11, 2001, indicted him on six counts of perjury before a grand jury, 18 U.S.C. § 1623. Before trial, the court disqualified Burke's attorney Thomas Durkin from participating in the trial based on the possibility, discussed in much greater detail below, that he would be called as a witness at trial. After a twelve-day trial, the jury convicted Burke on five of the six counts, and the court sentenced him to 240 months. The Seventh Circuit affirmed Burke's convictions on direct appeal but, in light of *United States v. Booker*, 543 U.S. 220 (2005), remanded for resentencing. *Burke*, 425 F.3d at 416-17. The court resentenced Burke to the same term, this time cognizant of its discretion under *Booker* to disregard the Sentencing Guidelines, and the Seventh Circuit affirmed the sentence. *Burke*, 281 F. App'x at 556. In his motion under 28 U.S.C. § 2255, Burke raises two grounds for relief from his convictions and sentence. First, he argues that appellate counsel was ineffective for failing to challenge the court's order disqualifying Burke's chosen counsel from participating in the trial. Second, he argues that trial and appellate counsel were ineffective for failing to argue the multiplicity of the offenses of conviction, which, he goes on to argue, means that his convictions and sentence violate the Double Jeopardy Clause.

## **ANALYSIS**

The Seventh Circuit has explained that "relief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). To succeed on his motion, Burke must show that his "sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

Before reaching the specifics of Burke's claims, the court pauses to consider the Government's assertion that Burke's failure to raise his current contentions on direct appeal bars

him from raising them now. (Gov't Br. at 3-4.) The Government is of course correct that a motion under § 2255 cannot generally be used to raise arguments that could have been presented earlier. *Bousley v. United States*, 523 U.S. 614, 622 (1998). Both of Burke's arguments, however, are raised under the guise of ineffective assistance of counsel, an issue appropriately raised on direct appeal in only the rarest of cases. Even in those rare cases, the failure to raise the issue on direct appeal does not bar raising it in collateral proceedings. *Massaro v. United States*, 538 U.S. 500, 504-05 (2003). The Government's objection to § 2255 relief on this basis is overruled.

### A. Disqualification of Counsel

To succeed on his claim that appellate counsel was constitutionally ineffective for failing to raise the disqualification issue, Burke must show that "appellate counsel's performance was deficient and that this deficiency prejudiced him." *Suggs v. United States*, 513 F.3d 675, 678 (7th Cir. 2008) (*citing Strickland v. Washington*, 466 U.S. 668 (1984)). As the Government points out, appellate counsel raised numerous issues: Burke's opening brief in the Seventh Circuit has a table of contents listing nine issues and the discussion section in the court's opinion is divided into nine sections, corresponding to those issues. Brief of Appellant at i-ii, *United States v. Burke*, No. 03-3483 (7th Cir. Aug 27, 2004); *Burke*, 425 F.3d at 400. The failure to raise yet another issue would only constitute deficient performance—and satisfy the first prong of the test for ineffective assistance—if that issue is significant and obvious as well as clearly stronger than the issues actually raised. *Suggs*, 513 F.3d at 678.

The first step in showing that the disqualification issue was significant, obvious, and clearly stronger than the issues actually raised on appeal is to show that the court's disqualification ruling was erroneous. Legally, the court's ruling was based on Local Rule 83.53.7(b):

> If a lawyer knows or reasonably should know that the lawyer may be called as a witness other than on behalf of the client, the lawyer may act as an advocate in a trial or evidentiary proceeding unless the lawyer knows or reasonably should know that the lawyer's testimony is or may be prejudicial to the client.

4

The problem of a lawyer serving as a witness normally arises when the lawyer seeks to offer testimony in support of her client. Even in those circumstances, courts are ordinarily reluctant to permit a lawyer to testify. A lawyer's acting as both advocate and witness generates, among other concerns, the appearance of impropriety and the "risk that the trier of fact will confuse the roles of advocate and witness and erroneously grant testimonial weight to an attorney's arguments." *United States v. Morris*, 714 F.2d 669, 671 (7th Cir. 1983); *see also* N.D. ILL. L.R. 83.53.7 cmt. When a lawyer's testimony will be prejudicial to her client, though, the risks of confusion and the appearance of impropriety are even greater. *Neumann v. Wright*, No. 93 C 2049, 1993 WL 384527, at *1 (N.D. Ill. Sept. 28, 1993). Those greater risks are reflected in the Rules: Local Rule 83.53.7(a) lists circumstances in which lawyers may testify in favor of their clients, but Rule 83.53.7(b) provides no exceptions to the ban on lawyers giving testimony that will prejudice their clients.

Factually, the court's ruling was based on the reasonable likelihood that Durkin, Burke's attorney, would be called as a witness. *United States v. Burke*, No. 01 CR 1049, Dkt. No. 52 (Ruling of July 12, 2002). Two of the most important government witnesses, Frederick Rock and James Taylor, had previously been represented by Durkin. The Government presented the court with the transcript of a taped telephone conversation between Durkin and Taylor, which, according to the Government, contained statements that were consistent with Taylor's grand jury testimony. *Id.* To corroborate Taylor's testimony at trial, then, the Government foresaw the possibility of calling Durkin as a witness. *Id.* Under Rule 83.53.7(b) the court—concerned with the specter of Durkin arguing to the jury against the credibility of a witness whose testimony he had himself corroborated from the witness stand—granted the Government's motion to disqualify Durkin from representing Burke at trial. *Id.* The court did, however, allow Durkin to continue representing Burke in all other proceedings. *Id.* Rick Halprin, assisted by Martin Yankellow, represented Burke at trial, but Durkin was present at all times and available to consult with Halprin outside the presence of the jury.

The record shows that Durkin remained directly involved with the proceedings, albeit only

5

when the jury was out of the courtroom. (Trial Tr. Vol. 4, at 606-16, 765-71; Vol. 5, at 917-37; Vol. 6, at 1024-26; Vol. 7, at 1211-15, 1447-57; Vol. 8, at 1512-19, 1663-67; Vol. 9, at 1674-76, 1746-54; Vol. 10, at 2117-32; Vol. 11, at 2349-60; Vol. 12, at 2469-71, 2510-95; Vol. 13, at 2597-2653, 2710, 2726-74, 2777, 2799-2805, 2827-37.) Although Durkin was not actually called to testify at trial, the jury heard a great deal about him. An FBI agent testified that Durkin had represented Burke before the grand jury. (*Id.* Vol. 8, at 1511.) More importantly, the jury heard testimony involving Durkin that the Government presented in an effort to bolster the testimony of Rock and Taylor. Both witnesses testified that Burke told them he had provided Erickson with the handcuff key. (*Id.* Vol. 8, at 1628-32, 1641-42; Vol. 11, at 2157-58.) In anticipation of an attack on Rock's credibility, the Government elicited testimony from him about a statement he had signed recanting testimony in an unrelated case. Rock testified that he had signed the statement only because he was physically threatened. (*Id.* Vol. 8, at 1610-17.) To support his story, Rock testified that after signing the document, he called his mother and his ex-girlfriend and told them to contact Durkin, his counsel at the time. (*Id.*) Tapes of those calls were played for the jury. (*Id.* Vol. 9, at 1720-27.) Rock testified that he met with Durkin the next day to discuss the matter, and that only a few days later, he and Durkin met with Government lawyers so Rock could tell them what happened. (*Id.* Vol. 8, at 1616; Vol. 9, at 1727-28.)

Taylor's testimony involved Durkin even more squarely. At trial, Burke contended that Taylor had manufactured his story for the purpose of seeking a reduced sentence. (Trial Tr. Vol. 14, at 2953-55, 2983-84.) Durkin's representation of Taylor was an integral part of the Government's rebuttal of that argument. After Taylor testified about his conversation with Burke, the Government played a recorded phone conversation between Taylor and his father in which Taylor learned for the first time that Durkin was representing Burke. (*Id.* Vol. 11, at 2218-37.) Taylor testified that he discussed the matter with Durkin in January 2002 and again in March 2002. (*Id.* at 2243-45, 2247-68.) In the first conversation, Taylor told Durkin that he knew Burke gave

6

Erickson the key. (*Id.* at 2244.) The second conversation was by telephone, and a recording of it was played for the jury. (*Id.* at 2247-68.) In that conversation, Taylor reminded Durkin what he had told him before and told him he had no interest in being involved in any case against Burke. (*Id.*) Shortly thereafter, Durkin withdrew from representing Taylor and a different lawyer consulted with him before sentencing. (*Id.* at 2270-71.) That lawyer discussed with Taylor the possibility of cooperating in the Government's case against Burke, but Taylor decided that he did not want to cooperate and proceeded to sentencing. (*Id.* at 2271-75.) The Government presented that lawyer's testimony, which was consistent with Taylor's. (*Id.* Vol.12, at 2394-2410.) Taylor did ultimately choose to cooperate with the government, but he made that decision later, when yet another lawyer had appeared on his behalf. (*Id.* Vol. 11, at 2278-81.) In closing, the Government argued that Taylor's consistent statements about what Burke had told him showed that he was telling the truth. (*Id.* Vol. 14, at 2903-18.) Moreover, argued the Government, if Taylor had manufactured his testimony about Burke to get a sentence reduction, he would not have made statements consistent with that testimony to Durkin, who he knew was representing Burke, and he would not have gone ahead with his own sentencing. (*Id.*)

Rule 83.53.7(b) imposes a blanket ban on a lawyer's offering testimony prejudicial to his client and thus prohibited Durkin from acting as trial counsel in this case. Burke nevertheless challenges the court's disqualification ruling and urges that appellate counsel was ineffective in not pressing that challenge on direct appeal. First, Burke points to a criminal defendant's strong interest in being represented by the attorney of his choice and points out that he was willing to waive any conflict. (Burke's Br., at 3.) He also points out that Taylor had waived the attorney-client privilege and that Rock had not given Durkin any privileged information. (*Id.* at 4.) A defendant's interest in being represented by the attorney of his choice is so strong that the erroneous disqualification of a defendant's chosen counsel is a structural error requiring automatic reversal on appeal. *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). Nevertheless, "the right to

7

counsel of choice 'is circumscribed in several important respects.'" *Id.* at 144 (*quoting Wheat v. United States*, 486 U.S. 153, 159 (1988)). As the Supreme Court held in *Wheat*, not all conflicts are waivable; courts have an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat*, 486 U.S. at 160;[1] *see also Gonzalez-Lopez*, 548 U.S. at 151-52 (noting the continuing viability of *Wheat*). Thus, despite Burke's strong interest in being represented at trial by Durkin, his counsel of choice, the court's refusal to accept his waiver of the serious conflict such representation would pose did not violate the constitutional right to counsel. *Wheat*, 486 U.S. at 162 ("where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver").

Burke also challenges the court's response to its determination that a conflict existed. He asserts that the Government had no need to call Durkin at all, and that rather than disqualifying Durkin, the court should have excluded the evidence that created the conflict. (Burke's Br., at 3-4.) The Seventh Circuit has held that "the introduction of evidence that would generate a conflict of interest is subject to analysis under Rule 403 of the Federal Rules of Evidence." *United States v. Gearhart*, 576 F.3d 459, 464 (7th Cir. 2009) (*citing United States v. Messino*, 181 F.3d 826, 830 (7th Cir. 1999)). It will only be "'on rare occasions,'" though, that evidence should be excluded to avoid a conflict of interest. *Id.* (*quoting Messino*, 181 F.3d at 830).

In support of his argument that Durkin's testimony was unnecessary, Burke first argues that the Government could simply have played the recording of the conversation between Taylor and Durkin without calling Durkin to testify. (Burke's Br. at 3-4.) In fact, that is what actually happened; the Government played the recording and chose not to call Durkin as a witness. The court ruled

---

[1] Defendant's chosen counsel in *Wheat* had a conflict somewhat similar to Durkin's; counsel would have been unable to effectively cross-examine one of the witnesses against his client because he represented that witness in a related prosecution. *Wheat*, 486 U.S. at 163-64.

on the disqualification motion well before that decision was made, though. In any event, in this case, playing the recording instead of presenting Durkin's testimony would not change the conflict analysis. Ordinarily, an attorney has no need to testify when the evidence she would present is easily available from other sources. *United States v. Britton*, 289 F.3d 976, 982 (7th Cir. 2002) (citing *United States v. Dack*, 747 F.2d 1172, 1176 n.5 (7th Cir. 1984)). In *Britton*, the lawyer's proffered testimony was available in billing records, so the court ruled that the testimony was unnecessary. *Id.* In this case, however, the other source could not be readily separated from the attorney; it was a recording with Durkin's own voice on it. Playing the recording would have been somewhat different than calling Durkin to the stand, but it would not have eliminated the appearance of impropriety and attendant jury confusion in having a defendant's lawyer so heavily involved in the evidence against his own client. Whether the evidence prejudicial to his client came from Durkin sitting in the witness box or from Durkin on a recording, that evidence disqualified Durkin from representing Burke at trial.

Burke also argues that presenting evidence about the conversation with Durkin was unnecessary because the Government was able to bolster Taylor's testimony with other evidence. (Burke's Br. at 4.) The other evidence he points to is testimony by the lawyer who consulted with Taylor before sentencing, testimony by Taylor's sister, and a tape of a conversation between Taylor and his father. (*Id.*) That evidence did constitute prior consistent statements that corroborated Taylor's testimony, and presenting prior consistent statements was one reason the Government wanted Durkin to testify. There was at least one other reason that Taylor's statements to Durkin were particularly useful to the Government, however; the fact that Taylor made his statements to Durkin, who also represented Burke, bolstered the conclusion that Taylor had not fabricated his testimony. The Government's argument was that if Taylor had fabricated his testimony against Burke in order to receive a benefit from the Government, he would not have brought up the fabrication with a lawyer who not only represented him but also represented Burke. That argument,

9

which could not be made without evidence regarding Durkin's representation, was so important to the Government's case that its probative value outweighed the prejudice from disqualifying Durkin. In other words, "the government's interest in proving its case beyond a reasonable doubt outweighed [Burke's] interest in continuity of counsel in this case." *Gearhart*, 576 F.3d at 465.

The other alternative to disqualifying Durkin from the whole trial that Burke suggests was to disqualify him only from cross-examining Rock and Taylor. (Burke's Br., at 5.) Halprin was available to do the cross-examinations, and that remedy might have been acceptable if the potential conflict was limited to overlapping representation. *See Britton*, 289 F.3d at 982-83; *United States v. Cellini*, 596 F. Supp. 2d 1194, 1199-2000 (N.D. Ill. 2009). As explained, though, things are different when the lawyer himself may be called to give testimony prejudicial to his client. Merely precluding Durkin from cross-examining certain witnesses would not have altered the appearance of impropriety and jury confusion caused by his anticipated testimony.

Finally, Burke suggests that the appearance of impropriety was not cured by sidelining Durkin because doing so did not prevent the jury from hearing about the conflict. (Burke's Br., at 5.) This argument misunderstands the purpose of the court's disqualification ruling. Burke contends that the integrity of the judicial process would not have been harmed any further by allowing Durkin to represent him at trial, but he is mistaken. The jury's hearing that a conflict existed at an earlier date that was handled properly (if not promptly) is much different than the jury observing a conflict *as it happens*.

For all these reasons, the court finds that disqualifying Durkin was not error. Because this neglected issue would not have been successful if raised on appeal, the court need not compare it to the issues that appellate counsel in fact chose to raise in the appeal. *Suggs*, 513 F.3d at 678. Accordingly, failing to challenge the disqualification order did not constitute deficient performance; Burke cannot satisfy the first prong of the *Strickland* test.

The court notes that even assuming deficient performance, Burke is unlikely to be able to

satisfy *Strickland*'s second prong, under which he would have to show that failing to raise the issue of disqualification "may have resulted in a reversal of the conviction, or an order for a new trial." *Winters v. Miller,* 274 F.3d 1161, 1167 (7th Cir. 2001) (quotation omitted). Burke concedes that to make such a showing he would not benefit from the holding of *Gonzalez-Lopez* that an erroneous disqualification is a structural error because the Seventh Circuit has held that *Gonzalez-Lopez* does not apply retroactively. *Rodriguez v. Chandler*, 492 F.3d 863, 866 (7th Cir. 2007). Rather, Burke would have to show, under pre-*Gonzalez-Lopez* precedent, that he suffered an adverse effect from the disqualification order, that is, "an identifiable difference in the quality of representation between the disqualified counsel and the attorney who represents the defendant at trial." *Rodriguez v. Chandler*, 382 F.3d 670, 675 (7th Cir. 2004) *abrogated by Gonzalez-Lopez,* 548 U.S. at 140. In an attempt to make that showing, Burke points to objections he believes Durkin would have made had he been trial counsel: to testimony Burke believes was impermissible evidence of his bad character and to evidence regarding Durkin's representation of Taylor. (Burke's Br., at 6-9.) The court has already explained why the second category of evidence was admissible, and, on direct appeal, the Seventh Circuit rejected a challenge to evidence similar to that in the first category. *Burke*, 425 F.3d at 409-11. Even assuming that raising the objections would have made a difference, the court can state with relative certainty that Durkin would not have brought them up for the simple reason that Durkin was present in the courtroom during trial and did not do so either himself when the jury was out of the room or through Halprin, with whom he consulted at every recess. The court notes its own observation that Halprin provided the highest quality of representation at trial. Accordingly, because Burke cannot satisfy *Strickland*'s first prong and because he is so unlikely to be able to satisfy its second prong, his motion is denied as to the issue of Durkin's disqualification.

  **B.**  **Double Jeopardy**

  Burke's second argument is that appellate and trial counsel were ineffective for failing to properly argue that the indictment charged multiplicitous counts and that, as a result, the court's

11

sentence of consecutive terms for four of the counts on which he was convicted violated the Double Jeopardy Clause. Burke raised this argument for the first time when he was being resentenced after his first appeal. As the Seventh Circuit held in deciding Burke's appeal from that resentencing, though, whether Burke's indictment was multiplicitous and his subsequent sentence violated the Double Jeopardy Clause was outside the scope of the remand. *United States v. Burke*, 281 F. App'x 556, 557 (7th Cir. 2008).[2] The court begins with the merits of this argument because, if the argument lacks merit, then counsel's failure to raise it before resentencing cannot constitute ineffective assistance of counsel. *Blacharski v. United States*, 215 F.3d 792, 794-95 (7th Cir. 2000).

An indictment is multiplicitous when a single offense is charged in separate counts. *United States v. Starks*, 472 F.3d 466, 468-69 (7th Cir. 2006). "Multiplicity in an indictment exposes a defendant to the threat of receiving multiple punishments for the same offense in violation of the Double Jeopardy Clause of the Fifth Amendment." *Id.* at 469. With respect to perjury, "[i]t is well established that separate lies before the grand jury are separately punishable, so long as different facts are needed to prove the falsity of each statement." *United States v. McComb*, 744 F.2d 555, 565-66 (7th Cir. 1984) (citations omitted). Another way of stating this test is that two statements can support punishment for two separate perjury counts so long as either one can be proven false without also proving the falsity of the other. *United States v. De La Torre,* 634 F.2d 792, 794 (5th Cir. 1981). Otherwise, the Government could "bludgeon a witness who is lying by repeating and rephrasing the same question, thus creating more possible perjury counts." *Gebhard v. United States*, 422 F.2d 281, 289-90 (9th Cir. 1970).

---

[2] The Seventh Circuit also suggested, in dicta, that Burke's multiplicity argument was not meritorious. *Burke*, 281 F. App'x at 557.

Burke argues that the following sets of questions and answers constitute a single crime:[3].

> Q: Did you talk to any other inmates [besides Jeffrey Erickson] about the handcuff key?
> A: No, I did not. No.

(Superseding Indictment, Count 1.)

> Q: Did you ever tell an inmate that you could smuggle contraband into the MCC?
> A: No, I did not. No.

(*Id.*, Count 2.)

> Q: Did you talk to Mr. Erickson about a handcuff key?
> A: No, I did not.

(*Id.*, Count 4.)

> Q: Did you provide Mr. Erickson with a handcuff key?
> A: No, I did not.

(*Id.*, Count 5.) Burke argues that his answers to these questions are all part of the same lie: He had bragged to other inmates that he helped Erickson obtain the key and then denied that he had done so before the grand jury. (Burke's Br. at 11-12.) Perhaps Burke's false statements are related, but even when statements "are all related and arise out of the same transaction or subject matter," they may still support non-multiplicitous counts of perjury. *United States v. De La Torre,* 634 F.2d 792, 795 (5th Cir. 1981). How closely connected the statements are may be relevant, but ultimately the test is the level of connection between the facts "needed to prove the falsity of each statement." *McComb*, 744 F.2d at 565-66. That test satisfies the court that each count of conviction charged Burke with an independent offense.

First, the facts needed to prove that Burke lied about the act of providing Erickson with the key (Count Five) are quite different from those needed to prove that he lied about making

---

[3] Counts Two and Four charged only one statement, but Count One charged three statements and Count Five charged two statements. The jury found that all the statements charged in Counts One and Five supported conviction on those counts. In considering Burke's multiplicity argument with respect to Counts One and Five, the court considers only a single statement supporting each Count because the parties have limited their arguments to those statements.

statements about the key and other contraband (Counts One, Two, and Four). Burke's theory that he was convicted for lying about false boasts he had made to other inmates shows that there are connections between Counts One, Two, and Four, but it also shows how different those counts are from Count Five. The facts necessary to prove the act of providing the key do not prove the acts of talking about the key or other contraband, and vice versa.

The facts necessary to prove that Burke lied when he said he never spoke to Erickson about the handcuff key (Count Four) and the facts necessary to prove he lied when he said he never spoke to other inmates about the handcuff key (Count One) are also distinct. Each statement can be proven false without proving the other one false because they are about Burke's conversations with *different people*. Burke could not have been punished both for falsely stating that he did not talk to Erickson about the key and for falsely stating that he talked to no inmate about the key because evidence proving the falsity of the first statement also proves the falsity of the second. The statements in Counts One and Four, though, are different because each statement can be proven by testimony about unrelated conversations.

The last remaining Count to consider is Count Two, which was based on Burke's testimony that he never told an inmate that he could smuggle contraband into the MCC. It is true that the same evidence *could* prove the falsity of this statement and Burke's statements that he had never spoken to Erickson or any other inmate about the handcuff key (Counts One and Four), but "two counts are not multiplicious simply because the same evidence that proves one also proves the second." *United States v. Stanfa*, 685 F.2d 85, 88 (3d Cir. 1982). "Rather, two counts are multiplicious if the evidence shows that *exactly* the same facts that would make out one violation also would make out the other."[4] *Id. (emphasis added)* That is not the case here. The evidence

---

[4] Careful readers will notice that the Third Circuit, writing in 1982, used the term "multiplicious" rather than "multiplicitous." As the Fourth Circuit has explained more recently, "multiplicitous" has become the preferred adjective form of "multiplicity," and "multiplicious" has become obsolete. *United States v. Goodine,* 400 F.3d 202, 207 n.6 (4th Cir. 2005) (citing BRYAN

supporting Count Two included testimony by MCC inmate Humberto Gil-Vidarte that Burke offered to provide him with a passport and medication. (Trial Tr. Vol. 6, at 1188-92.) Gil-Vidarte also testified that Burke told him he could smuggle small objects into the MCC through the visiting room and that he had contraband smuggling "down to a science." *(Id.* at 1192-93, Vol. 7, at 1242.) The evidence supporting Count One was testimony by inmates Rock and Taylor that Burke talked to them about the handcuff key. (Trial Tr. Vol. 8, at 1628-32, 1641-42; Vol. 11, at 2157-58.) And the evidence supporting Count Four included Gil-Vidarte's and Richard Luttrell's testimony that they overheard Burke and Erickson discussing the handcuff key. (Trial Tr. Vol. 6, at 1197-98; Vol. 10, at 1956-57.) Because different facts supported each count, Counts One, Two, and Four are not multiplicitous. Thus, no two counts are multiplicitous and Burke's convictions and sentence do not violate the Double Jeopardy Clause. Failure to raise the multiplicity argument did not constitute ineffective assistance of counsel, and Burke's motion is denied as to this argument.

---

A. GARNER, A MODERN DICTIONARY OF LEGAL USAGE 576-77 (2d ed. 1995)). As evidence in support of that conclusion, the court notes that the Seventh Circuit has not used "multiplicious" in a published opinion since 1989. *United States v. Marren,* 890 F.2d 924, 932, 934 (7th Cir. 1989).

**CONCLUSION**

For the foregoing reasons, Burke's Motion to Vacate, Set Aside, or Correct Sentence [1] is denied.

ENTER:

Dated: April 21, 2010

REBECCA R. PALLMEYER
United States District Judge